**SO ORDERED: February 24, 2005.**



**James K. Coachys**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| 1ST CARRIER CORP., ) | |
| TORYMAC, INVESTMENTS, INC., ) | Case No. 04-18653-JKC-11 |
| YURWAY TRANSPORTATION, INC., ) | (Jointly Administered) |
| and CZ RYAN, INC., ) | |
| ) | |
| Debtors. ) | |

**AMENDED ORDER DENYING EQUILEASE'S MOTION FOR RELIEF FROM STAY**

This matter came before the Court on the Motion for Relief from Stay (the "Motion") filed by Equilease Financial Services, Inc., as servicer for EQ Transportation, Inc., a beneficial interest holder in the Conseco Finance Leasing Trust f/k/a/ Green Tree Leasing Trust ("Equilease"), and on Debtor Yurway Transportation, Inc.'s ("Yurway") Objection thereto. The Court conducted a hearing on December 13, 2004, at the conclusion of which it ordered the parties to file post-hearing briefs. Those briefs having been filed and considered, the Court now issues the following Amended Order[1]

---

[1] The Court issues this Amended Order to correct a typographical error that appeared in the second-to-last sentence of the original Order. In all other respects, the orders are identical.

denying Equilease's Motion.

**Facts and Procedural Background**

The undisputed facts evident from the record and as presented by the parties show that:

1. On or about November 3, 1998, Yurway entered into a Master Vehicle Lease (the "1998 Lease") with Green Tree Leasing Trust ("Green Tree") pursuant to which Green Tree agreed to lease Yurway the following tractors: (1) a 1999 Freightliner, Serial Number 1FUPCSZB5XLA 09917 ("Freightliner 9917"); and (2) a 1999 Freightliner, Serial Number 1FUPCSZB6XLA 09912 ("Freightliner 9912) (collectively, "the Freightliners"). Under the 1998 Lease, Yurway was to make monthly payments of $3,722.60 for the Freightliners for a period of 48 months, for total lease payments of $178,684.80. The total cost of the Freightliners, according to the 1998 Lease, was $188,260.00.

2. On October 3, 2002, at the completion of the 1998 Lease, Yurway entered into an Equipment Lease Agreement (TRAC) (the "2002 Lease") with Equilease. Under the 2002 Lease, Yurway was to make monthly payments of $3,521.84 for the Freightliners for a period of 24 months, for total lease payments of $84,524.16.

3. Under its terms, the 2002 Lease expired on October 11, 2004, four days after the commencement of this bankruptcy case. Yurway has not made the payments due under the 2002 Lease for February, 2004 through and including September, 2004.

4. Yurway is also liable for a Terminal Rental Adjustment for each vehicle equal to 9.89% of the "Lessor's Cost, as reflected in the Lease." The only Lessor Cost that appears to be reflected in the 2002 Lease is the "Original Equipment Cost" of $94,130.00. Thus, it appears that

the total Terminal Rental Adjustment due under the 2002 Lease is $18,618.91.

5.  A total of $46,792.72, plus late fees, interest, costs and attorney fees, is now due under the 2002 Lease.

6.  Section 8 of the 2002 Lease states that "both parties hereto intend this Lease to qualify as a 'statutory finance lease' under Article 2A of the Uniform Commercial Code . . . ."

7.  Under the 2002 Lease, Equilease is to remain the owner of the Freightliners. The Certificates of Title for the Freightliners are consistent with that. The Lease also provides that Yurway must maintain title and registration for the Freightliners, pay all taxes due and maintain and pay for appropriate levels of insurance on the vehicles.

8.  Yurway continues to use only one of the Freightliners in the ordinary course of its business. It is not using the other Freightliner because its license and registration have expired.

9.  On November 22, 2004, Equilease filed its Motion under § 362(d)(1)[2] of the Code, essentially arguing that "cause" exists to lift the stay because the 2002 Lease has expired by its terms. Yurway, in turn, insists that the 2002 Lease is a "disguised" security interest, that it has substantial equity in the Freightliners and that the Freightliners are necessary to an effective reorganization.

### Discussion and Decision

The dispositive question presented by Equilease's Motion is whether the 2002 Lease is a

---

[2] On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
    (1) for cause, including the lack of adequate protection of an interest in property of such
    party in interest;
    (2) with respect to a stay of an act against property under subsection (a) of this section if–
        (A) the debtor does not have an equity in such property; and
        (b) such property is not necessary to an effective reorganization . . . .

"true lease" rather than, as Yurway argues, a "disguised" security interest. Even for the purpose of making determinations of federal law under the Bankruptcy Code, state law determines the existence, scope and nature of a debtor's property.[3] The determination of whether a "lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable state or local law." *In re Powers,* 983 F.2d 88, 90 (7th Cir.1993). Here, the 2002 Lease provides that it will be governed by the laws of New York. The Court, therefore, looks to New York law to determine whether the Lease is a true lease or security transaction.[4]

Article 2A of the New York Uniform Commercial Code explains that a lease is "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale . . . or retention or creation of a security interest is not a lease." N.Y. U.C.C. § 2A-103(1)(j). Revised § 1-201(37) of the Uniform Commercial Code, which was adopted by New York in 1994 and made effective June 30, 1995, defines "security interest" as an "an interest in personal property or fixtures which secures payment or performance of an obligation. . . ." N.Y. U.C.C. § 1-201(37). It further provides:

> (a) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
>
>> (I) the original term of the lease is equal to or greater than the remaining economic life of the goods,
>> (ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

---

[3] The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

[4] While the 2002 Lease is governed by New York law, the Court nevertheless cites, where instructive, to cases issued in jurisdictions that have also adopted Revised U.C.C. § 1-201(37).

4

>   (iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or
>   (iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(b) A transaction does not create a security interest *merely* because it provides that:

>   (I) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,
>
>   (ii) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,
>
>   (iii) the lessee has an option to renew the lease or to become the owner of the goods,
>
>   (iv) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or
>
>   (v) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(c) For purposes of this subsection (37):

>   (I) Additional consideration is not nominal if (A) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (B) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;
>
>   (ii) "Reasonably predictable" and "remaining economic life of the goods" are

>to be determined with reference to the facts and circumstances at the time the transaction is entered into; and
>
>(iii) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

*Id*. (italics added).

As set forth above, the process of determining whether a lease is a "true lease," as opposed to a security interest, starts with the basic directive that the nature of the transaction is determined by the "facts of each case." Notwithstanding this directive, Revised U.C.C. § 1-201(37) provides that without looking at all of the facts, a lease will be construed as a security interest if the lessee cannot terminate the lease and if one of the four enumerated terms is present in the lease. *See In re Pillowtex, Inc.*, 349 F.3d 711, 717, 718 (3rd Cir.2003)(applying New York law); *In re Zaheha*, 159 B.R. 581, 584 (Bankr.D.Idaho1993). If none of these "per se" terms are present in the lease, the court must look at all of the facts of the case, focusing on the "economic realities" of the transaction. BARKLEY CLARK, THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE ¶ 1.05[1] (Revised Ed. 2004).

The key aspect of a true lease is whether the lessor retains a meaningful residual interest in the property at the lease's conclusion. *See Zaheha*, 159 B.R. at 585. Revised U.C.C. § 1-201(37)(c) makes clear, however, that certain factors previously relied upon by courts in examining the nature of a purported lease are not, by themselves, determinative. *Id*. at 585. In applying these standards to the present case, labels used by the parties are also not determinative. Where the transaction is

denominated a lease, the burden is on the debtor/lessee to demonstrate that the transaction is in fact a disguised security interest rather than a true lease. *See, e.g., Pillowtex*, 349 F.3d at 716.[5]

To determine whether the 2002 Lease is a disguised security interest as a matter of law under Revised U.C.C. § 1-207(37)(a), the Court must first examine whether Yurway may terminate the 2002 Lease at will. There is no express provision in the 2002 Lease dealing with termination. Arguably, Schedule A of the 2002 Lease implicitly gives Yurway the ability to terminate it. There is, however, a substantial cost to termination. As indicated by Schedules A and B, upon termination or expiration of the Lease, Yurway is obligated to pay, among other things, a Terminal Rental Adjustment based on a sliding-scale percentage–from 49.32% at the beginning of the Lease to 9.89% at the expiration of the Lease–of the original cost of the Freightliners. In the absence of any express provision allowing Yurway to terminate the 2002 Lease and because of the substantial cost associated with early termination, the Court cannot conclude that the 2002 Lease is terminable at will.

The question then becomes whether any of the four terms enumerated in Revised U.C.C. § 1-201(37)(a)(I)-(iv) are present here. The Court answers that question first by disposing of the most obvious of the terms. There is nothing in the 2002 Lease to suggest that Yurway is bound to renew the Lease for the remaining economic life of the Freightliners or to become the owner of the Freightliners. There is also nothing in the 2002 Lease granting Yurway an option to renew the Lease for *any* consideration, nominal or otherwise.

---

[5] In determining the parties' respective burdens of proof, the Court also looks to § 362(g) of the Code, which states that the party requesting relief from the stay has the burden of proof on the issue of the debtor's equity in property, while the party opposing stay relief has the burden of proof on all other issues.

In determining whether the 2002 Lease grants Yurway an option to become the owner of the Freightliners for no or nominal consideration, the Court first notes that both parties have characterized Schedule A to the 2002 Lease–labeled as the "Terminal Rental Adjustment Provisions"–as a purchase option. The Court disagrees with that characterization.

Schedule A states in relevant part:

> For each item of Equipment leased under this Lease, the parties agree to make a Terminal Rental Adjustment as of the date on which the term (including any Renewal) of the Lease expires or is otherwise terminated and such date shall be the Termination Date for purposes of this Schedule and Schedule B to the Lease. The Terminal Rental Adjustment shall be in an amount (the "Terminal Rental Adjustment Amount") equal to the Terminal Rental Adjustment Percentage, as reflected on Schedule B as of the applicable Termination Date, multiplied by Lessor's Cost, as reflected in the Lease, for the subject Equipment, plus any amounts due and owing through the Termination Date.
>
> As to each item of Equipment leased under this Lease, Lessee agrees to pay to Lessor the amount by which the Terminal Rental Adjustment Amount, as of the Termination Date, exceeds the Net Proceeds of Sale (as determined below) for the subject Equipment. Such amount shall be paid by Lessee to Lessor within ten (10) days after notice from Lessor, plus any other amounts remaining due under the Lease, without abatement, set-off, or counterclaim arising out of any circumstance. If the Net Proceeds of Sale for the subject Equipment exceeds the Terminal Rental Adjustment Amount, Lessor shall pay to Lessee the excess, less any amounts due under the Lease.
>
> For purposes hereof, Net Proceeds of Sale shall be determined as follows. Upon receipt by Lessor of a returned item of Equipment, Lessor shall cause such Equipment to be sold at public or private sale, at wholesale, for the best cash offer available. The proceeds of such sale received by Lessor, net of the costs of sale, cleaning, repairing, equipping, storing, insuring and/or transporting said Equipment and any other expenses of Lessor in connection therewith, shall be the Net Proceeds of Sale. If the subject Equipment is leased, the Net Proceeds of Sale shall be the present value, as of the Termination Date, of the aggregate rentals of such lease using a discount factor equal to the per annum lending rate publicly announced as of the commencement date of such lease, by Chase Manhattan Bank as its prime rate plus 3%. If any equipment is not returned to Lessor, or if Lessee is prevent from taking possession thereof, the Net Proceeds of Sale for such Equipment shall be zero.

8

According to Schedule A, the Freightliners automatically revert to Equilease at the conclusion of the Lease, at which time Equilease is required to sell or lease them.[6]  Yurway's liability under the 2002 Lease is then adjusted upwards or downwards based upon the sale price of the Freightliners.  The provision does not, however, give Yurway the right or ability to purchase the Freightliners at the end of the 2002 Lease.[7]  As such, the Court concludes that Yurway does not have an option to purchase the Freightliners for *any* consideration, nominal or otherwise.

The only remaining factor, then, is whether the original term of the 2002 Lease is equal to or greater than the "remaining economic life" of the Freightliners.  For purposes of § 1-201(37), "remaining economic life" is to be "determined with reference to the facts and circumstances at the time the transaction is entered into."  Revised U.C.C. § 1-201(37)(c)(ii).  Beyond this explanation, the Court has found little case law or commentary explaining how "remaining economic life" is to be measured.

In support of its position, Yurway presented testimony from Jeffrey Lanman, its Chief Financial Officer, that the industry's average useful life of tractors like the Freightliners is five years.  Mr. Lanman indicated that he has wide experience in the trucking industry and is familiar with

---

[6] This "Terminal Rental Adjustment Clause" or "TRAC" creates what is often referred to as an "open-end" lease.  *See In re Grubbs Constr. Co.*, 319 B.R. 698 (Bankr.M.D.Fla.2005).

[7] There are a number of cases which hold that an open-end lease such as the one here are "intended for security" and are, thus, disguised security interests.  *See, e.g., id.*  Under New York law, however, a lease containing a "terminal rental adjustment clause" in the context of a commercial transaction, as opposed to a consumer transaction, does not, in itself, mean that the lease is not a "true lease."  *See In re Owen*, 221 B.R. 56, 63 (Bankr.N.D.N.Y.1998)(citing New York Vehicle and Traffic Law § 397-b which states: "Notwithstanding any other provision of law, in the case of motor vehicles or trailers which are *not* vehicles or trailers leased or used primarily for personal, family, or household purposes, a transaction does not create a conditional sale or security interest *merely* because it provides that the rental price is permitted or required to be adjusted under the agreement either upward or downward by reference to the amount realized upon sale or other disposition of the motor vehicle or trailer.") (italics added).

valuation. Thus, while not qualified as an expert, the Court finds Mr. Lanman's testimony to be both credible and persuasive.

On cross-examination, Equilease did not challenge Mr. Lanman's statement regarding the Freightliners' alleged five-year useful life. Nor did it present any testimony of its own regarding the Freightliners' "remaining economic life." It did, however, present evidence regarding various values for the Freightliners, the most objective and reliable of which–the October 2004 Truck Blue Book–indicates that the Freightliners each have a wholesale value of $27,825 and a retail value of $37,100. While this is compelling evidence of the Freightliners' present value, it tells the Court very little about their "remaining economic life" as determined by the facts and circumstances present when the parties executed the 2002 Lease. For this reason, the Court puts little weight on it. Even if the Freightliners' present value is relevant, their value is diminished by the fact that they are overdue for substantial maintenance work. Mr. Lanman testified that the Freightliners needed major overhauls at the 550,000 (they are now at 780,000 miles and 805,000 miles respectively) mileage mark. Notwithstanding the fact that the Freightliners were well maintained, this is likely to be a sizeable expense.

According to federal tax law, the "class life" or useful life of the Freightliners, as "tractors used over the road," is four years. *See* Rev. Proc. 87-56, Asset Class § 0.26. Accordingly, Equilease was allowed to depreciate them over a three-year period. *See* 26 U.S.C. §§ 167 and 168 (applying the Modified Accelerated Cost Recovery System to the Freightliners as property placed in service after December 31, 1986). While not controlling, the Freightliners' useful life for tax purposes is consistent with Mr. Lanman's testimony that the term of the 2002 Lease exceeds the Freightliners' "remaining economic life." Furthermore, tax law provides an objective measure that is instructive

in determining the "facts and circumstances" at the time the parties entered into the 2002 Lease. *See* CLARK, *supra,* at ¶ 1.05[1] (explaining that Revised U.C.C. 1-201(37) is more objective and takes focus off the intent of the parties); *see also Pillowtex*, 349 F.3d at 721 (New York U.C.C. no longer looks to parties' intent to determine whether transfer is a lease or security interest).

Based on the preponderance of the evidence, the Court must conclude that the term of the 2002 Lease exceeded the remaining economic life of the Freightliners. For this reason, the Lease is, as a matter of law, a disguised security interest rather than a true lease under § 1-201(37)'s "per se" test.

Even if the Lease did not extend past the Freightliners' remaining economic life, the Court finds additional support under the facts of this case to conclude that the 2002 Lease is a disguised security interest. *See QDS Maintenance, Inc.*, 258 B.R. 659, 669 (Bankr.E.D.Tex.2000)("If a court determines that [§ 1-201(37)'s bright-line test] does not compel a conclusion that a security interest was create per se, it should proceed to an examination of all the facts to determine whether the economic realities of a particular transaction create a security interest.")(citations omitted)); *see also Pillowtex*, 349 F.3d at 719.

As explained by the bankruptcy court in *Grubbs*:

> The central feature of a true lease is the reservation of a an economically meaningful interest to the lessor at the end of the lease term. Ordinarily, this means two things: (1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial state (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term.

*Grubbs*, 319 B.R. at 715 *(*citing *Sankey v. ABCO Leasing, Inc.* (*In re Sankey*), 307 B.R. 674, 680 (Bankr.D.Alaska 2004) (citing Edwin E. Huddleson, III, *Old Wine in New Bottles: UCC Article 2A*

11

*Leases*, 39 Ala.L.Rev. 615, 625 (1988) (quoted in 4 JAMES L. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30-3 at 15 (5th ed. 2002))).

Applying that standard here, the Court must conclude that the 2002 Lease is a disguised security interest. As already explained, the Freightliners have not retained, and were not expected to retain, *significant* residual value. While they admittedly have some wholesale and retail value, their value is significantly diminished by the fact that they are in need of major overhauls. Moreover, under the 2002 Lease's rather broadly drawn TRAC, Equilease will recover a pre-determined amount, as defined by Schedule B, regardless of the Freightliners' current value.[8] It appears, then, that Yurway and not Equilease bore "the possibility of gain and the risk of loss" that the Freightliners would lose value over the life of the 2002 Lease. From this, the Court concludes that Equilease did not retain an "entrepreneurial risk" in the Freightliners' value.

The Court notes that under the 1998 and 2002 Leases, Yurway was to pay $218,827.87, while the original cost of the Freightliners was $188,260.00. Equilease has adequately recovered its investment, plus interest,[9] in the Freightliners and whatever else it stands to gain from them is relatively insignificant. *See Pillowtex*, 349 F.3d at 719-20 (complete return of lessor's original investment suggests that the transaction is a secured transaction rather than a lease). The Court also notes that under the 2002 Lease, Yurway bears the risk of loss and is obligated to insure the

---

[8] The Court finds the TRAC in the 2002 Lease to be "broadly drawn" because it makes no reference to the Freightliners' condition or mileage in calculating the amount due under the clause and because Yurway cannot terminate the lease and return the Freightliners at will. TRACs are, however, not created equal. Some are more narrowly drawn than others and give the lessor a more meaningful residual interest than the one at issue here. Accordingly, the Court does not wish to imply TRACs necessarily defeat "true lease" status. For a good discussion of this issue, including descriptions of different types of TRACs, see *Huddleson*, *supra.*, at 11.

[9] By the Court's calculation, Yurway paid approximately 12% interest over the life of the Leases.

Freightliners and to pay all taxes associated with them. Yurway is also responsible for maintaining license and registration on the Freightliners. Equilease, in turn, has explicitly disclaimed all warranties.

In light of all relevant facts and given the "economic realities" of the parties' transaction, the Court must conclude that the 2002 Lease is not a true lease but is, instead, a disguised security interest. Under New York law, the Court admittedly cannot rest that conclusion merely on the TRAC. *See* n.7, *supra*. Likewise, under Revised U.C.C. § 1-201(37)(b), the Court cannot rest its conclusion merely on the fact that the payments due under the 2002 Lease exceed the Freightliners' original purchase price or that Yurway must pay taxes, insurance, registration and other fees and costs. However, neither statute precludes the Court from considering these factors, so long as long as they are not, when taken alone, determinative. *See Owen*, 221 B.R. at 64 (In passing New York Vehicle and Traffic Law § 397-b, "the legislature intended to ensure that a lease containing a [TRAC] in the context of a commercial transaction was presumed to be a 'true' lease in the absence of evidence to the contrary."); *Pillowtex*, 349 F.3d at 711 (whether the aggregate rental payments under a purported lease are equal to or greater than the original cost of the leased property remains a valid factor under Revised U.C.C. § 1-201(37). It must be emphasized, then, that none of these factors, taken alone, are determinative in this case. When viewed in the aggregate, however, they compel the Court to conclude that the 2002 Lease is not a true lease.

## Conclusion

Based on the foregoing applications of § 1-201(37), Yurway has established that cause does not exist to lift the stay pursuant to § 362(d)(1) of the Code. Even when viewed as a security interest, Equilease is not entitled to relief. The evidence shows that the Freightliners are worth

approximately $56,000 to $74,000, while Yurway owes approximately $44,000 under the 2002 Lease. This is sufficient equity to foreclose relief under § 362(d)(2). Furthermore, Yurway may be entitled to avoid Equilease's lien rights, assuming they are unperfected. This, too, makes stay relief inappropriate. Equilease's Motion for Relief is, therefore, DENIED.

###

Distribution

KC Cohen
Jeannette E. Hinshaw
UST
Service List